11-4945-bk
Algonquin Power Income Fund v. Christine Falls of NY, Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

**SUMMARY ORDER**

**Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.**

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, at 40 Foley Square, in the City of New York, on the 30th day of January, two thousand thirteen.

Present:    ROBERT A. KATZMANN,
            RAYMOND J. LOHIER, JR.,
                        *Circuit Judges,*
            JED S. RAKOFF,
                        *District Judge.*[*]

_____

ALGONQUIN POWER INCOME FUND, ALGONQUIN POWER
CORPORATION, INC., ALGONQUIN POWER U.S. HOLDINGS, INC.,
ALGONQUIN POWER FUND (CANADA), INC., ALGONQUIN
POWER SYSTEMS, INC.,

            *Appellants*,

            - v -                                              No. 11-4945-bk

CHRISTINE FALLS OF NEW YORK, INC., TRAFALGAR POWER,
INC.,

            *Appellees.*
_____

For Appellants:                    JEFFREY A. DOVE, Menter, Rudin & Trivelpiece, P.C.,
                                   Syracuse, N.Y.

_____

[*] The Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

For Appellees:                                      PAUL J. YESAWICH III (Laura W. Smalley and
                                                    David M. Capriotti, *on the brief*), Harris Beach
                                                    PLLC, Pittsford, N.Y.

Appeal from the United States District Court for the Northern District of New York (Hurd, *J.*).

**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court be and hereby is **REVERSED** and the case is **REMANDED** with directions to enter judgment for the adversary defendants.

Adversary Defendants-Appellants Algonquin Power Income Fund; Algonquin Power Corporation, Inc.; Algonquin Power U.S. Holdings, Inc.; Algonquin Power Fund (Canada), Inc.; and Algonquin Power Systems, Inc., (collectively, "Algonquin") appeal from an October 25, 2011, Memorandum-Decision and Order of the United States District Court for the Northern District of New York (Hurd, *J.*).  The district court's decision affirmed a decision of the United States Bankruptcy Court for the Northern District of New York (Gerling, *J.*) granting summary judgment to Adversary Plaintiffs-Appellees Christine Falls of New York, Inc., and Trafalgar Power, Inc., (collectively, "Trafalgar").  Trafalgar claims that Algonquin does not have a valid security interest in the damages awarded to Trafalgar in a commercial tort action against a third party.

In 1988, Trafalgar secured a loan of $22.5 million from Aetna Insurance Company in connection with the development of seven hydroelectric power plants in upstate New York.  The parties executed an indenture agreement and a Consolidation, Extension, Spreader and Modification Agreement ("Consolidation Agreement") to effect the transaction.  In 1996, after Trafalgar had defaulted, the parties restructured the loan by executing a number of documents, including (1) an Amended and Restated Collateral Trust Indenture ("Amended Indenture"),

2

which amended and restated the 1988 indenture agreement in its entirety, and (2) an Extension and Modification Agreement ("Modification Agreement"), which "effect[ed] certain modifications" to the Consolidation Agreement, J. App'x 346. At the same time, Trafalgar entered into a separate Management Agreement under which it agreed that Algonquin would assume operational responsibility for the plants. In 1997, Aetna sold the loan to Algonquin, and approximately two years later Algonquin declared Trafalgar in default and accelerated the amount due under the notes.

The parties dispute whether the Amended Indenture, the Consolidation Agreement as altered by the Modification Agreement, or both assign Algonquin a security interest in the damages awarded to Trafalgar in an engineering malpractice action against Stetson-Harza, an engineering firm, and Neal Dunlevy, an engineer. Trafalgar Power, Inc., brought suit against Stetson-Harza and Dunlevy in 1989, after the original indenture and Consolidation Agreement were executed but before the Amended Indenture and the Modification Agreement were executed. In 1999, several years after the Trafalgar loan was restructured, a jury found Stetson-Harza and Dunlevy liable. Stetson-Harza paid Trafalgar Power, Inc., $11.1 million in 2001 pursuant to a stipulation of settlement. We assume the parties' familiarity with the remaining facts and procedural history of this case, and we discuss them below only as necessary to explain our decision.

Algonquin claims that both the Amended Indenture and the Consolidation Agreement (as altered by the Modification Agreement) assign Algonquin a security interest in the proceeds of the engineering malpractice action. Because we hold that the latter assigns Algonquin the interest at issue, we do not reach the parties' dispute with respect to the former.

3

The first question that we must resolve is whether New York or Connecticut law governs the Consolidation Agreement. The Consolidation Agreement provides that it "shall be construed, interpreted, enforced and governed by and in accordance with the internal laws of the State of New York, without regard to principles of conflict of laws." J. App'x 208. The Modification Agreement provides that "[t]his Agreement shall be governed by, and construed and enforced in accordance with, the internal law of the State of Connecticut." J. App'x 350. It is clear from the entirety of the Modification Agreement that the Connecticut choice of law provision applies to the Modification Agreement alone and not to the Consolidation Agreement, which remains governed by New York law.

The Modification Agreement defines "the Existing Mortgage" to mean the original mortgages, as consolidated, spread, extended, and modified pursuant to the Consolidation Agreement. J. App'x 346. The Modification Agreement states explicitly that any modifications to the Existing Mortgage are "expressly provided herein." J. App'x 350. Paragraphs 3 and 4 describe particular modifications to the Existing Mortgage. Those modifications are express: Paragraph 3 is titled "Modifications to the Existing Mortgage," and Paragraph 4 defines a term used "in the Existing Mortgage." By contrast, the choice of law provision in Paragraph 6 of the Modification Agreement does not expressly modify the Existing Mortgage; it does not refer to the Existing Mortgage at all.

Moreover, the choice of law provision in the Modification Agreement by its own terms refers only to the law that governs "[t]his Agreement," that is, the Modification Agreement in which the provision appears. This interpretation is bolstered by the reference in Paragraph 6 of the Modification Agreement with respect to how "*[t]his Agreement* may be executed . . . ." (emphasis added). J. App'x 350. The Consolidation Agreement was executed eight years prior;

4

in 1996, the details of execution were relevant only to the Modification Agreement and not to the agreement that it modified. In light of the text of the choice of law clause, as well as the entirety of the Modification Agreement, we hold that the choice of law clause in the Consolidation Agreement remains unmodified. Consequently, the Consolidation Agreement is governed by New York law.

We turn to our consideration of the body of New York law that governs. In 1988, when the Consolidation Agreement was executed, and in 1996, when it was amended by the Modification Agreement, Article 9 of the Uniform Commercial Code ("U.C.C.") was in effect in New York. The 2001 amendments adopting revised Article 9 had not yet been enacted. Pre-revision Article 9 of the U.C.C., as adopted in New York at the time of the transactions, governed "any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, [and] general intangibles . . . ." N.Y. U.C.C. LAW § 9-102(1)(a) (McKinney 1996) (amended 2001). However, § 9-104(k) of pre-revision Article 9 of the U.C.C. explicitly excluded from coverage "a transfer in whole or in part of any claim arising out of tort." N.Y. U.C.C. LAW § 9-104(k) (McKinney 1996) (amended 2001). The engineering malpractice claim arose out of tort. Consequently, pre-revision Article 9 of the U.C.C. does not govern any purported assignment of the engineering malpractice claim.[2]

Instead, the pre-Code common law of assignment applies. *See Israel Disc. Bank Ltd. v. Gottesman (In re Ore Cargo, Inc.)*, 544 F.2d 80, 82 (2d Cir. 1976) (holding that tort claims

---

[2] Because we hold that the Consolidation Agreement assigns a security interest in the tort claim to Algonquin pursuant to New York common law, we do not reach Algonquin's argument that pursuant to pre-revision Article 9 of the U.C.C. the Consolidation Agreement assigns a security interest that attached after the asset became (1) a judgment, (2) a claim against a bond, (3) a claim under a contract, and (4) a fund in a restricted escrow account.

exempted from pre-revision Article 9 of the New York U.C.C. are governed by "the pre-Code common law of assignment or pledge."). We turn to the common law of New York to interpret the Consolidation Agreement.

In interpreting a contract under New York common law, "[w]ords and phrases are given their plain meaning." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (alteration in original) (quoting *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (App. Div. 1990)). Trafalgar argues that the plain language of the Consolidation Agreement does not assign the engineering malpractice judgment. In response, Algonquin argues that paragraphs 10, 12, and 14 of the Consolidation Agreement assign a security interest in the engineering malpractice claim pursuant to New York common law. Although portions of the language to which Algonquin points are too limited to assign an interest in the engineering malpractice claim, paragraph 12(b) is sufficiently broad to encompass the claim. It assigns "all contract rights, general intangibles, *actions and rights in action* . . . arising from or relating to any of the" real property (including the sites of the hydroelectric plants) or related personal property rights in which a security interest is assigned in prior paragraphs of the Consolidation Agreement. J. App'x 195 (emphasis added). The engineering malpractice action "relat[ed] to" the real property assigned because the negligence alleged was a failure to properly measure the sites. Trafalgar does not address this particular language or refute the common-sense interpretation that the engineering malpractice claim is an "action[ or] right[] in action . . . relating to . . . the property." We conclude that the plain language of paragraph 12(b) assigns Algonquin a security interest in the tort claim.[3]

---

[3] Even if Trafalgar's interest in the Stetson-Harza claim was acquired after the execution of the Consolidation Agreement, paragraph 14(a) of the Consolidation Agreement assigns any after-acquired property of the types described in paragraph 12(b).

Trafalgar contends that even if the plain language of the Consolidation Agreement assigns a security interest in the claim, the assignment is invalid under New York common law because the language in the Consolidation Agreement identifying the malpractice claim is insufficiently specific. Trafalgar cites case law stating that "[i]n order to make a valid assignment, the owner must manifest an intention to make the assignee the owner of the claim . . . [and] to accomplish a completed transfer of the entire interest of the assignor in the particular subject of assignment." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17 (2d Cir. 1997) (internal quotation marks omitted). Trafalgar argues that the Consolidation Agreement fails to assign the engineering malpractice claim in compliance with these requirements because it does not specifically assign the Stetson-Harza tort claim in particular or even tort claims in general.

Trafalgar fails to distinguish between a common law requirement of specificity sufficient to identify the property assigned and a common law requirement that *each individual* property interest be specifically identified. New York common law does not incorporate the latter requirement. *See Platt v. Lott*, 17 N.Y. 478, 480 (1858) ("[I]f upon looking at the assignment . . . we are able clearly to see that it was the intent of the assignors to convey to the assignee their whole property, we are bound to give effect to that intent."); *Mathews v. Poultney*, 33 Barb. 127, 135 (N.Y. Sup. Ct. 1860) ("It has certainly not been held to be the law of this state, that the failure to attach, to a general assignment, a schedule of either property or debts, makes the assignment void."). Indeed, assignments of general types or categories of property are effective under New York common law to transfer property interests in tort actions. *See RTC Mortg. Trust 1994 N-1 v. Fidelity Nat'l Title Ins. Co.*, 16 F. Supp. 2d 557, 559, 564 (D.N.J. 1998) (holding that assignment of all of the assignor's right, title, and interest in and to (1) mortgage

7

loans, (2) all documents related to the mortgage loans, and (3) all proceeds derived in any way from the mortgage loans included the assignment a tort claim for negligent misrepresentation or legal malpractice related to the loans). The language in Paragraph 12(b) is consequently sufficiently specific to assign the Stetson-Harza tort claim.

We find additional support for this conclusion in a close reading of the Consolidation Agreement. Paragraph 12(b) of the Consolidation Agreement assigns "all contract rights, general intangibles, actions and rights in action . . . relating to any of the property." J. App'x 195. In order to ascribe meaning to the terms "actions and rights in action," we must construe those terms to be broader than an interest in "all contract rights," which is listed separately. We predict that the New York Court of Appeals would deem the language with respect to "actions and rights in action" sufficient under New York common law to effect the assignment of tort claims, such as the engineering malpractice claim here. *See Banque Arabe et Internationale D'Investissement v.. Md. Nat'l Bank*, 57 F.3d 146, 151-52 (2d Cir. 1995) (holding that where a contract assigned both an "interest" in an agreement and a loan and an "interest in the transaction" effected by the agreement and the loan, the New York Court of Appeals would likely construe the latter to include an interest in tort claims in order to ascribe meaning to all of the contract terms). "This conclusion is . . . consistent with the general trend in New York toward adopting principles of free assignability of claims . . . ." *Id.* at 153.

Finally, we consider whether New York's adoption of revised Article 9 of the U.C.C. in 2001 affects the enforceability of the assignment. Under the transition rules of revised Article 9, transactions and liens remain valid after the effective date of revised Article 9 if (1) they were not governed by pre-revision Article 9 and (2) they were validly entered into before the adoption of revised Article 9. *See* N.Y. U.C.C. LAW § 9-702(b)(1) (McKinney 2012). Such transactions

8

are enforceable by either revised Article 9 *or* by the law that would apply if revised Article 9 had not taken effect. *See* N.Y. U.C.C. LAW § 9-702(b)(2) (McKinney 2012).[4] The assignments here (1) were not governed by pre-revision Article 9 (which excluded from coverage all claims arising out of tort) and (2) were valid under previously effective law (i.e., New York common law). Consequently, the Consolidation Agreement's assignment of the tort claim remains valid under revised Article 9 and may be enforced pursuant to the common law of New York.

For the foregoing reasons, the judgment of the district court is **REVERSED** and the case is **REMANDED** with directions to enter judgment for Algonquin.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK

---

[4] Section 9-702(b) of revised Article 9 as adopted in New York provides: "Continuing validity. Except as otherwise provided in subsection (c) and Sections 9-703 through 9-709: (1) transactions and liens that were not governed by Former Article 9, were validly entered into or created before Revised Article 9 takes effect, and would be subject to Revised Article 9 if they had been entered into or created after Revised Article 9 takes effect, and the rights, duties, and interests flowing from those transactions and liens remain valid after Revised Article 9 takes effect; and (2) the transactions and liens may be terminated, completed, consummated, and enforced as required or permitted by Revised Article 9 or by the law that otherwise would apply if Revised Article 9 had not taken effect." N.Y. U.C.C. LAW § 9-702(b) (McKinney 2012).